IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

KAREN E. GREENE                    *

           Plaintiff             *

           vs.                   *    CIVIL ACTION NO. MJG-13-190

HARRIS CORPORATION, et al.         *

           Defendants            *

*      *      *      *      *      *      *      *      *

## MEMORANDUM AND ORDER RE: MOTION TO DISMISS

The Court has before it Defendants' (Harris Corporation and
Harl Dan Pierce) Motion to Dismiss [Document 24] and the
materials submitted relating thereto.  The Court has held a
hearing and has had the benefit of the arguments of counsel.


I.   BACKGROUND[1]

At all times relevant hereto, Defendant Harris Corporation
("Harris"), a "global corporation" with its headquarters in
Melbourne, Florida, has maintained an office in Columbia,
Maryland.  For fourteen years, from about 1996 through early
2010, Plaintiff Karen E. Greene ("Greene") provided office
cleaning services to the Harris office in Columbia.  For most of
this period, there were no problems in the working relationship.

---

[1]   The "facts" herein are as alleged by Plaintiff and are not
necessarily agreed upon by Defendants.

On March 1, 2008, "[Greene] and Harris entered into a renewable contract for janitorial services at the Columbia office," with the contract automatically renewing each year.[2] Corrected First Amended Complaint ("FAC") ¶¶ 18-19.  Problems developed after Defendant Harl Dan Pierce ("Pierce") began working at Harris' Columbia office as Director of Engineering in October 2008.  Pierce acted rudely toward Greene.  For instance, he never responded to greetings from Greene, "acting as if she were invisible . . . while cordially responding to other (sic) employees."  Id. ¶¶ 23-24.

During a meeting in December 2009, Pierce stated to Harris employees (outside the presence of Greene) that "Greene dressed like a man, 'which really bothered him.'"  Id. ¶ 33.  Pierce further "described Ms. Greene as 'frumpy, dumpy and dresses like a man in flannel and jeans.'"  Id. ¶ 34.  Pierce asked the employees if Greene's appearance bothered them as well, to which they replied no.  "Pierce then repeated that Ms. Greene was 'frumpy, dumpy, mopey, gloomy, [adding] the way she mopes around here. . . . It bothers me.'"  Id. ¶ 39 (alterations in original).  In late January to early February 2010, Pierce made similar remarks about Greene's appearance to a different group

---

[2]     Greene does not allege that during this time she was a Harris employee rather than an independent contractor.

of Harris employees at a staff meeting.[3]  At that meeting, a

Harris employee informed Pierce that Greene is a lesbian, and

Pierce "appeared visibly upset and then disgusted."  Id. ¶¶ 47-

48.

Shortly thereafter, Pierce reviewed Greene's invoices for

the previous several months, "claim[ing] that he reviewed Ms.

Greene's contract for 'budgetary reasons.'"[4]  Id. ¶¶ 50-51.

"According to Mr. Pierce, Harris paid Ms. Greene . . . '[m]ore

than double the going market rate for cleaning.'"[5]  Id. ¶ 56.

However, "Harris documents refuted [Pierce's] contention."  Id.

¶ 57.  At the time of the review of Greene's contract in

February 2010, "Ms. Greene's contract was the only one Mr.

Pierce reviewed for alleged budgetary concerns.  Id. ¶ 59.

Pierce had his secretary draft a letter "stat[ing] that

Harris was terminating Ms. Greene's contract for budgetary

reasons" as of March 6, 2010.  Id. ¶¶ 60-62.  When she was

cleaning Pierce's office, Greene found the letter sitting

directly on top of the waste basket.  Id. ¶¶ 64, 67-68.  At

Pierce's request, Greene met with Pierce that day.  Pierce told

---

[3]    The Corrected First Amended Complaint states: "There is no
evidence that Mr. Pierce complained about the personal
appearance or manner of dress of other Harris employees."  First
Amended Complaint ("FAC") ¶ 49.

[4]    "Harris had reviewed 'budgetary issues'" roughly nine
months earlier around June 2009 and "had taken budget-reducing
action, including layoffs." Id. ¶¶ 53-54.

[5]    The context in which Pierce allegedly made this comment is
not specified in the FAC.

Greene "that he did not mean for her to see the letter." Id.
¶ 79.  Greene responded, "'[y]ou have treated me like dog shit,
therefore, I have no respect for you, Mr. Pierce.'"  Id. ¶ 80.
According to Harris employees who were present at the meeting,
throughout the conversation with Pierce, "Greene acted in a calm
and professional manner."  Id. ¶ 81.

Upon Pierce's request, Greene agreed to continue cleaning
the Harris office until March 31, 2010.  During Greene's
remaining time at Harris, "Pierce continued to disparage
[Greene]."  Id. ¶ 101.  Pierce also made efforts to avoid Greene
and, on one occasion, asked his secretary "if she knew anything
about Ms. Greene's relationship with another Harris female
employee."  Id. ¶¶ 102-07.

On April 1, 2010, Pierce contracted with Eurest Services,
Inc. ("Eurest") to provide cleaning services for Harris'
Columbia office.  Id. ¶ 109.  During the next seven months, the
Eurest service was poor - the cleaning crews often did not show
up and/or did not give an explanation for their absences, and
the crews provided less than adequate cleaning.  Id. ¶¶ 111-22.

"In December 2010, Eurest hired Ms. Greene as a janitor to
clean the Harris office, beginning December 6, 2010."  Id.
¶ 123.  Greene was hired as a full-time employee of Eurest.
Eurest assigned Greene to the Harris office location.  Pursuant

to the Master Service Agreement ("contract") between Eurest and Harris, <u>Eurest was responsible for</u>:

- "workers' compensation insurance;"

- "withholding taxes;"

- "benefits, such as retirement, health, vacation pay, sick pay, or other benefits plan [sic];"

- "federal unemployment compensation;" and

- "employer's liability insurance."

<u>Id.</u> ¶¶ 128-32.  The contract "granted Harris control over employees [that Eurest] sent to clean the office."  <u>Id.</u> ¶ 134.

Under the contract, <u>Harris had the right to</u>:

- "'[i]nterview and otherwise evaluate all [Eurest] personnel assigned to [the Harris office];'"

- "'accept or reject any [Eurest] individual(s) based upon their experience;'" and

- "'require [Eurest cleaning] personnel to submit to Harris' standard drug testing.'"

<u>Id.</u> ¶ 135.  Further, <u>Harris was responsible for</u>:

- "'supply[ing] all c-fold towels, roll towels, toilet tissue, trash bags, [and] hand soap;'"

- "'keep[ing] janitorial closets stocked at all times;'" and

- "'meet[ing] with on site supervisor and review[ing] effectiveness on a weekly basis for the first 3 months.'"

Id. ¶ 137.  "Harris chose the days on which Ms. Greene worked at
its office," and a Harris employee was Greene's on-site
supervisor.  Id. ¶¶ 138-39.

Greene was scheduled to begin cleaning Harris' Columbia
office on December 6, 2010. Id. ¶ 123.  On that very day, when
Pierce saw Greene cleaning, he "immediately had Harris security
escort her from the premises." Id. ¶¶ 146-47.  The same day,
Pierce emailed Russell Moodie, Sr. Facilities Manager, and
stated: "'[Greene] is the woman whom we dismissed because she
was charging us $5000 a month.  This is the woman who
inappropriately searched my office and screamed obscenities at
me.  [W]hat is going on?'"[6]   Id. ¶ 147.

"[A]round December 10," Pierce called Eurest and stated
"that Harris had prohibited Ms. Greene from the premises and
[that] Eurest had to immediately remove her from working at the
office." Id. ¶ 154.  "Eurest immediately terminated Ms.
Greene's employment." Id. ¶ 161.

On December 16, 2010, Greene filed a discrimination
complaint against Harris with the Howard County Office of Human
Rights ("OHR"), asserting discrimination on the basis of sexual
orientation and personal appearance in violation of the Howard
County Code, "Unlawful Employment Practices" § 12.208(I)(a),

---

[6]     "During the Howard County Office of Human Rights
investigation, Mr. Pierce recanted these two allegations." Id.
¶ 153.

(II)(a)(1)-(2).  Id. ¶ 166.  On December 21, 2011, after completing its investigation, the OHR found probable cause that Harris had discriminated against Greene, "causing her contract non-renewal and her termination from Eurest."  Id. ¶ 169.

On November 28, 2012, Greene filed the instant action in the Circuit Court for Howard County, Maryland against Harris and Pierce, presenting claims in three Counts:

> Count I:      Discrimination Based on Sexual Orientation
>
> Count II:     Discrimination Based on Personal Appearance/Manner of Dress
>
> Count III:    Tortious Interference with Business Relationship – Eurest

On January 17, 2013, Harris timely removed the action to this Court.[7]  Harris and Pierce subsequently moved to dismiss the action for failure to state a claim.  In response, Greene asserted that Harris was liable for employment discrimination pursuant to a "lent employee/dual employment" theory because in December 2010, she was an employee not only of Eurest, but also of Harris.  See [Document 18] at 2-3.  On July 24, 2013, this Court dismissed the Complaint but permitted Greene to file an amended complaint.  [Document 20].  The Court instructed Greene

---

[7]      After being served with the Complaint on January 19, 2013, Pierce joined and consented to Harris' Notice of Removal. [Document 11].

"to allege specific facts [as to] the details of her engagement,
supervision, working conditions, etc." with Harris.  <u>Id.</u> at 12.

Greene filed the FAC [Document 23] on September 3, 2013,
presenting the same three causes of actions included in the
original Complaint.

By the instant motion, Harris and Pierce seek dismissal of
all claims against them pursuant to Federal Rule of Civil
Procedure 12(b)(6).


II.   <u>DISMISSAL STANDARD</u>

A motion to dismiss filed pursuant to Federal Rule of Civil
Procedure 12(b)(6)[8] tests the legal sufficiency of a complaint.
A complaint need only contain "'a short and plain statement of
the claim showing that the pleader is entitled to relief,' in
order to 'give the defendant fair notice of what the . . . claim
is and the grounds upon which it rests.'"  <u>Bell Atl. Corp. v.
Twombly</u>, 550 U.S. 544, 555 (2007) (alteration in original)
(citations omitted).  When evaluating a 12(b)(6) motion to
dismiss, a plaintiff's well-pleaded allegations are accepted as
true and the complaint is viewed in the light most favorable to
the plaintiff.  However, conclusory statements or "a formulaic
recitation of the elements of a cause of action will not

---

[8]   All "Rule" references herein are to the Federal Rules of
Civil Procedure.

[suffice]."  Id.  A complaint must allege sufficient facts "to cross 'the line between possibility and plausibility of entitlement to relief.'"  Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009) (quoting Twombly, 550 U.S. at 557).

Inquiry into whether a complaint states a plausible claim is "'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'"  Id. (quoting Twombly, 550 U.S. at 557).  Thus, if "the well-pleaded facts [contained within a complaint] do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'"  Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009) (alteration in original)).


III.  DISCUSSION[9]

A.  Employment Discrimination Claims (Counts I & II)

In Counts I and II of the First Amended Complaint, Greene alleges that Harris discriminated against her on the basis of her sexual orientation and personal appearance/manner of dress in violation of the Howard County Code ("HCC").

---

[9]    Given the fact that the claims presented in the FAC are identical to those presented in the original Complaint, the discussion of the applicable legal standards is taken largely from the Court's first Memorandum and Order Re: Motion to Dismiss, issued July 24, 2013.  See [Document 20].

The "Unlawful Employment Practices" Section of the HCC,
§ 12.208(II)(a)(1), states that "[i]t shall be unlawful if,
because of discrimination, an employer. . . [d]ischarges a
person." Sexual orientation and personal appearance are
included in the protected classes covered by the HCC. <u>See</u>
<u>id.</u> § 12.208(I)(a).

Thus, for Greene to hold Harris liable for employment
discrimination against her, she must first establish that she
was an employee of Harris during the relevant time period when
the alleged discrimination occurred - December 6 to 10, 2010.

Harris contends that it cannot be held liable under Counts
I and II because Harris was not Greene's employer in December
2010. Greene asserts that Harris was her employer under a "lent
employee/dual employment" theory.

1. <u>Legal Principles</u>

Although the definitions of protected classes differ, the
HCC provision for employment discrimination is analogous to that
used in the Maryland[10] and federal[11] employment discrimination
statutes.

---

[10]    Md. Code Ann., State Gov't § 20-606(a)(1)(i) ("An employer
may not . . . discharge . . . any individual . . . because of .
. . the individual's race, color, religion, sex, age, national
origin, marital status, sexual orientation, genetic information,
or disability unrelated in nature and extent so as to reasonably
preclude the performance of the employment . . . .").

The HCC, in language essentially the same as that used in the Maryland[12] and federal[13] counterpart provisions, defines an "employer" as "a person, engaged in an industry or business, who has five or more full-time or part-time employees for each working day in each 20 or more calendar weeks in the current or previous calendar year and any agent of such a person."  Howard County Code, § 12.208(I)(d).  An "employee" is defined as "an individual employed by an employer."  Id. § 12.208(I)(c).

The Maryland Court of Appeals has stated that "'Title VII is the federal analog to Article 49B of the Maryland Code' and 'our courts traditionally seek guidance from federal cases in

_____

[11]   Title VII, 42 U.S.C. § 2000e-2(a)(1) ("It shall be an unlawful employment practice for an employer . . . to discharge any individual . . .  because of such individual's race, color, religion, sex, or national origin . . . .") .

[12]   Under Maryland state law, an "employer" is defined as:
> (i)  a person that:
>> 1.   is engaged in an industry or business; and
>> 2.   has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year; and
> (ii) an agent of a person described in item (i) of this paragraph.

Md. Code Ann., State Gov't, § 20-601(d)(1).  An "employee" is defined as "an individual employed by an employer."  Id. § 20-601(c)(1).

[13]   Under Title VII, the federal employment discrimination statute, an "employer" is defined as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person."  42 U.S.C. § 2000e(b).  An "employee" is defined as "an individual employed by an employer."  Id. § 2000e(f).

interpreting Maryland's Article 49B.'"[14] Taylor v. Giant of Md.,
LLC., 33 A.3d 445, 459 (Md. 2011)(quoting Haas v. Lockheed
Martin Corp., 914 A.2d 735, 742 & n.8 (Md. 2007)); see also
Countess v. Maryland, No. ELH-12-02252, 2014 WL 201591, at *5
(D. Md. Jan. 16, 2014) ("Maryland courts interpreting S.G. § 20-
601 (formerly Art. 49B, § 16 of the Maryland Annotated Code)
have often found federal cases arising under Title VII to be
persuasive authority."); Bishop v. Bd. of Educ. of Calvert
Cnty., No. DKC 11-1100, 2011 WL 2651246, at *9 (D. Md. July 5,
2011) ("Maryland courts routinely look to Title VII cases to
determine the scope of liability under Title 20.").

The United States Court of Appeals for the Fourth Circuit
considers a multitude of factors in assessing whether a
plaintiff is an employee of the defendant employer for purposes
of a Title VII employment discrimination claim.  These include,
in addition to the right to control the putative employee:

> (1)   the kind of occupation, with reference
>       to whether the work usually is done
>       under the direction of a supervisor or

---

[14]   Md. Code Ann., State Gov't §§ 20-601 to -609 replaces the
provisions of Article 49B that governed employment
discrimination.  See Countess v. Maryland, No. ELH-12-02252,
2014 WL 201591, at *5 (D. Md. Jan. 16, 2014) (observing that
§ 20-601 of the State Government Article of the Maryland Code
was formerly Article 49B, § 16 of the Maryland Code).  Section
42(a) of Article 49B permitted "a person who [wa]s subjected to
an act of discrimination prohibited by the [Howard C]ounty code
[to] bring and maintain a civil action against the person who
committed the alleged discriminatory act."

is done by a specialist without
supervision;

(2) the skill required in the particular
occupation;

(3) whether the "employer" or the
individual in question furnishes the
equipment used and the place of work;

(4) the length of time during which the
individual has worked;

(5) the method of payment, whether by time
or by the job;

(6) the manner in which the work
relationship is terminated; i.e., by
one or both parties, with or without
notice and explanation;

(7) whether annual leave is afforded;

(8) whether the work is an integral part of
the business of the "employer";

(9) whether the worker accumulates
retirement benefits;

(10) whether the "employer" pays social
security taxes; and

(11) the intention of the parties.

Garrett v. Phillip Mills, Inc., 721 F.2d 979, 982 (4th Cir.

1983) (internal citations omitted);[15] see also Barnett v.

Uniformed Servs. Univ. of the Health Sciences, No. DKC 10-2681,

---

[15]    In Garrett, the Fourth Circuit "w[as] construing the
definitions of 'employee' and 'employer' under the Age
Discrimination in Employment Act ('ADEA'), [but] the operative
language in ADEA is identical to the operative language in Title
VII, so the analysis utilized under either act is
interchangeable."  Haavistola v. Cmty. Fire Co. of Rising Sun,
Inc., 6 F.3d 211, 219 n.2 (4th Cir. 1993).

2011 WL 3511049, at *7 (D. Md. Aug. 9, 2011) (quoting <u>Garrett</u>, 721 F.2d at 982).[16]  However, "control is still the most important factor to be considered, but it is not dispositive." <u>Garrett</u>, 721 F.2d at 982; <u>see also Barnett</u>, 2011 WL 3511049, at *7.[17]

"Under [a joint employer theory], multiple entities may be found to have 'jointly exercised the requisite amount of control for Title VII liability to hold . . . .'" <u>Takacs v. Fiore</u>, 473 F. Supp. 2d 647, 656 (D. Md. 2007).  Courts in the Fourth Circuit follow the same "control and eleven factors" test outlined in <u>Garrett</u> for determining whether an individual qualifies as an employee of multiple employers.  <u>See, e.g.,</u>

---

[16]   The Court of Appeals of Maryland "has traditionally considered five criteria in determining whether or not an employer/employee relationship exists between two parties." <u>Whitehead v. Safway Steel Prods., Inc.</u>, 497 A.2d 803, 808 (Md. 1985).  "These criteria . . . include (1) the power to select and hire the employee, (2) the payment of wages, (3) the power to discharge, (4) the power to control the employee's conduct, and (5) whether the work is part of the regular business of the employer."  <u>Id.</u> (citations omitted).

[17]   Similar to the Title VII test, the employee/employer determination in Maryland focuses on control as the overriding factor.  <u>See id.</u> at 809 ("Of the five factors, the factor of control stands out as the most important. We have said, for example, that whether the employer 'has the right to control and direct the employee in the performance of the work and in the manner in which the work is to be done' is the 'decisive,' or 'controlling' test." (citations omitted)).

Williams v. Grimes Aerospace Co., 988 F. Supp. 925, 934–36
(D.S.C. 1997).[18]


    2.   Adequacy of Allegations

    The FAC does not contain sufficient factual allegations to
present a plausible claim that Greene was an employee of Harris
when the alleged discrimination occurred in early December
2010.[19]

    To avoid dismissal, a complaint must contain sufficient
factual averments to give rise to a plausible claim, i.e., to
present a plausible contention that all of the elements of the
claim can be established.  In the instant case, this requires
particular factual assertions, not conclusory statements,
regarding the existence of the employee/employer relationship
between Greene and Harris during the relevant time period at

---

[18]    The day after the hearing on the pending Motion to Dismiss,
counsel for Greene sent the Court, without explanation as to
relevance or significance, Notice 915.002 issued by the United
States Equal Employment Opportunity Commission ("EEOC") on
December 3, 1997, "Enforcement Guidance: Application of EEO Laws
to Contingent Workers Placed by Temporary Employment Agencies
and Other Staffing Firms."  The Notice contains a non-exhaustive
list of factors used to determine whether staffing firm workers
are employees under federal anti-discrimination laws.  There is
significant overlap between these factors and those outlined by
the Fourth Circuit in Garrett.

[19]    The FAC does not specifically allege that Harris qualifies
as an "employer" under the employment discrimination provisions
of the Howard County Code.  Since Defendants did not refer to
this omission, the Court will proceed as if the FAC alleged
"employer" status on the part of Harris.

issue – early December 2010.  See, e.g., Mangram v. General

Motors Corp., 108 F.3d 61, 63 (4th Cir. 1997) (applying Garrett

in the context of an Age Discrimination in Employment Act claim

and concluding that "Mangram's claim must fail because he has

not alleged facts which would establish that he was an employee

or that an employment relationship was ever contemplated during

any phase of his relationship with General Motors").

The FAC does not include factual allegations adequate to

present a plausible claim that, at the time at issue, Harris, in

addition to Eurest, was an employer of Greene.

Greene has failed to allege specific facts that certainly

would be within her personal knowledge, without any need for

discovery, regarding the details of her engagement, supervision,

working conditions, etc.  There are inadequate, if any, factual

allegations specific to Greene's work situation as distinct from

the terms of the contract between Eurest and Harris.  Further,

contrary to Greene's contention, the FAC does not present

factual allegations such as those held sufficient in Barnett v.

Uniformed Services University of the Health Sciences to present

a plausible claim of an employment relationship.[20]

---

[20]   The Court finds the allegations in the instant case to be
analogous to those in Cimino v. Borough of Dunmore, a case from
the Middle District of Pennsylvania that involved Title VII
claims made by an employee of a cleaning service - Dustbusters,
Inc. - against the entity to which she was assigned to clean –
Borough of Dunmore.  See No. 3:02CV1137, 2005 WL 3488419, at *

In Barnett, a judge of this Court determined that the plaintiff was an employee of both (1) a corporation that provided personnel and business support services and (2) a Department of Defense medical school and research facility ("USUHS") with which the corporation had contracted to provide those services.  See No. DKC 10-2681, 2011 WL 3511049, at *1, 7-8 (D. Md. Aug. 9, 2011).  The Barnett court reasoned that "Ms. Barnett's daily activities were supervised and directed exclusively by USUHS employees" and that "Ms. Barnett also alleged that USUHS interviewed and hired [her], furnished her workspace and 'all of the tools, materials and equipment that Ms. Barnett used,' and 'created the procedures Ms. Barnett followed in performing her job.'"  Id.  at *7.  The Barnett court concluded that "Ms. Barnett has alleged that USUHS exercised substantial control over Ms. Barnett's activities, and, thus, an employment relationship between USUHS and Ms. Barnett."  Id.

---

1, 4 (M.D. Pa. Dec. 21, 2005).  The Cimino court determined that the plaintiff was not an employee of the Borough of Dunmore, in part because "the Borough directed what needed to be cleaned, but Dustbusters determined how to clean the building, . . . the Borough did not pay Cimino, [and] Cimino [sic] was hired by Dustbusters and assigned to work for the Borough."  Id. at *7. The court concluded that "[t]he minimal control that [the Borough] asserted over Cimino was purely as a customer of Dustbusters, not as Cimino's employer."  Id. at *8 (emphasis added).

While Greene alleges that "Harris was [in addition to Eurest] Ms. Greene's employer," FAC ¶ 133, Greene fails to support this conclusion with specific factual allegations about the circumstances of her relationship with Harris in December 2010.  The plaintiff in Barnett was interviewed and hired by USUHS, not by the contracting corporation.  In contrast, Greene was hired by Eurest, the corporation that contracted to provide the janitorial services, and not by Harris, the corporation that received the janitorial services.  Id. ¶¶ 123-24, 127.  Further, Eurest assigned Greene to the Harris office; Harris did not select Greene to work at its office.  Id. ¶ 125.

Whereas the plaintiff in Barnett alleged that USUHS "assigned her specific duties and tasks" and "'created the procedures Ms. Barnett followed in performing her job,'" Barnett, 2011 WL 3511049, at *1, 7, Greene simply alleges that the contract between Eurest and Harris granted Harris control over her, and then she discusses the terms of the contract.  FAC ¶¶ 134-37.  Greene fails to support this conclusory allegation with facts that show how Harris exercised this control.  For example, Greene alleges that the contract granted Harris the right to interview and accept or reject Eurest personnel, but does not allege that this is what occurred when she was assigned to Harris in December 2010.  Although the contract between Eurest and Harris stated that Harris was required to provide

janitorial supplies, Greene does not allege that Harris actually provided her with those supplies.  Moreover, Greene identifies a Harris employee who was to be her on-site supervisor but does not explain how that individual supervised her during her time at Harris.

Significantly, the plaintiff in <u>Barnett</u> worked for USUHS for about a year and a half,[21] compared to the <u>de minimis</u> duration of Greene's work at Harris – the alleged discrimination occurred on the very day Greene commenced work in December 2010.  <u>See id.</u> ¶¶ 123, 146–47.

Assuming, without deciding, that the contract between Eurest and Harris reflected an intention that Harris could be an additional employer of Eurest personnel – rather than just a customer of Eurest served by a Eurest employee[22] – the allegations in the FAC make it rather clear that with respect to Greene's <u>specific employment situation</u>, Harris did not intend to be Greene's employer in December 2010.  The contract provided Harris with "'the right . . . to accept or <u>reject any</u>

---

[21]    From September 2006 until her termination in April 2008.  <u>See</u> <u>Barnett v. Uniformed Servs. Univ. of the Health Sciences</u>, No. DKC 10-2681, 2011 WL 3511049, at *1-2, 8 (D. Md. Aug. 9, 2011).

[22]    The Court need not decide whether the parties to the contract between Eurest and Harris intended for Harris to be a customer of Eurest, but it is important to note that the contract specifically states, "'[Eurest] personnel [would be] assigned to <u>perform</u> <u>services</u>'" for Harris, not that the Eurest personnel would "work for" or otherwise be "employed by" Harris.  <u>See</u> FAC ¶ 135.

<u>individual(s)</u> based upon their experience.'"  FAC ¶ 135
(emphasis added).  That is exactly what happened to Greene.
Based upon Greene's experience with the company, as soon as
Pierce saw Greene at the Harris office on December 6, 2010, he
had her escorted from the premises – effectively "rejecting" her
as "'[Eurest] personnel assigned to perform services'" at the
Harris office.  <u>See</u> <u>id.</u>  Harris did not even accept Greene as
the Eurest personnel assigned to clean the office; thus, it did
not become her employer in December 2010.

The FAC fails to present a plausible claim that Harris was
Greene's employer.

Accordingly, the Court shall dismiss all claims in Counts I
and II.


        B.   <u>Tortious Interference (Count III)</u>

To establish a claim of tortious interference with an
economic, or business, relationship in Maryland, a plaintiff
must prove:

> "(1) intentional and willful acts;
>
> (2)  calculated  to  cause  damage  to  the
>      plaintiffs in their lawful business;
>
> (3)  done with the unlawful purpose to cause
>      such damage and loss, without right or
>      justifiable  cause  on  the  part  of  the
>      defendants  (which  constitutes  malice);
>      and

(4)   actual damage and loss resulting."

Painter's Mill Grille, LLC v. Brown, 716 F.3d 342, 354 (4th Cir. 2013) (quoting Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc., 650 A.2d 260, 269 (Md. 1994)).  That is, a claim for tortious interference with a business relationship requires factual allegations sufficient to support a plausible claim that the defendant (1) had tortious intent and (2) engaged in improper or wrongful conduct.  Alexander & Alexander Inc., 650 A.2d 260, 271 (Md. 1994).  Thus, "tortious intent alone, [i]s not sufficient to turn deliberate interference into a tort, b[ecause] the defendant [also] must interfere through improper or wrongful means."  Id.

In this context, "tortious intent" means the "intent 'to harm the plaintiff or to benefit the defendant at the expense of the plaintiff.'"  Id. (citation omitted).  The defendant's conduct must be "independently wrongful or unlawful, quite apart from its effect on the plaintiff's business relationships."  Id. "Wrongful or unlawful acts include common law torts and 'violence or intimidation, defamation, injurious falsehood or other fraud, violation of criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith.'"  Id. (citations omitted).  However, "'actual malice,' in the sense of ill will, hatred or spite, may be sufficient to make an act of interference wrongful where the defendant's

malice is the primary factor that motivates the interference."
Id.

The FAC does not contain specific factual allegations to present a plausible claim that there was a "wrongful act." Greene alleges that on December 6, 2010, the day she returned to clean the Harris office in Columbia, Pierce "had Harris security escort her from the premises. FAC ¶¶ 146-47. According to Greene, four days later, on December 10, 2010, Pierce called Eurest and "lied, saying that Harris had prohibited Ms. Greene from the premises and Eurest had to immediately remove her from working at the office."[23] Id. ¶ 154.

Greene does not provide factual support for the conclusory allegation that "Mr. Pierce's telling Eurest that Harris had barred Ms. Greene from the property was a lie." See id. ¶ 156. Indeed, Greene seeks to avoid the matter by stating that "[e]ven after [Pierce] terminated Ms. Greene and her contract [in early 2010], Mr. Pierce asked her to stay and clean another month until he obtained a successor cleaning service" and that no one "ever told Ms. Greene she was barred from the premises". Id. ¶¶ 157-58. However, the FAC is devoid of factual allegations that Greene had not, in fact, been barred from the Harris premises by

---

[23]   The allegations that the information contained in Pierce's December 6 email to a Harris co-worker were "outright lies" is immaterial to the discussion of whether Harris and/or Pierce impermissibly interfered with Greene's relationship with Eurest.

the time she was removed on December 6, 2010 or when Pierce
called Eurest on December 10.[24]

Greene "does not allege facts from which this court could
infer that defendants' conduct was wrongful or unlawful" because
she "does not allege any specific tortious conduct done by
defendants" Harris or Pierce.  See Goode v. Am. Veterans, Inc.,
874 F. Supp. 2d 430, 448 (D. Md. 2012).  In her Response to the
instant Motion – but not in the FAC - Greene states that "Mr.
Pierce committed the independent wrongful acts of defamation and
injurious falsehood." [Document 31] at 27.  This statement,
even if it had been in the FAC, would be no more than a mere
conclusory allegation.  "While a court must accept the material
facts alleged in the complaint as true, statements of bare legal
conclusions 'are not entitled to the assumption of truth' and
are insufficient to state a claim." Aziz v. Alcolac, Inc., 658
F.3d 388, 391 (4th Cir. 2011) (citations omitted).

According to the FAC, on December 10, Pierce told Eurest
"that Harris had prohibited Ms. Greene from the premises and
Eurest had to remove her from working on the property."  FAC
¶ 241.  However, "Mr. Pierce did not provide Eurest with any
reasons for barring [Greene] from the Harris officers."  Id.

---

[24]    In fact, given that Pierce had Greene escorted from the
Harris premises on December 6, FAC ¶¶ 146-47, it would appear
that Greene actually was barred from the premises on December 10
when Pierce called Eurest.  Id. ¶ 154.

¶ 242.   Pierce's failure to provide a reason for Greene's being barred from the Harris premises certainly could not rise to the level of being a defamatory statement or injurious falsehood. Compare Kwang Dong Pharm. Co. v. Han, 205 F. Supp. 2d 489, 496 (D. Md. 2002) (concluding that Han "sufficiently alleged an underlying tortious act [of defamation] in support of his tortious interference with business advantage claim" because he "alleg[ed] that KD falsely told Georgetown that Han had misappropriated research money for his own use and had not met his research schedule"), with Baron Fin. Corp. v. Natanzon, 471 F. Supp. 2d 535, 541-42 (D. Md. 2006) (concluding that "[t]he facts alleged [by Natanzon] are not sufficient to support a prima facie case of defamation," and that Natanzon therefore could not support a claim of tortious interference with a business relationship, where the counterclaim alleged that the counter-defendants made comments that they "were taking legal action against . . . Natanzon seeking substantial money damages").

The Court finds Count III of the FAC inadequate to present a plausible claim of tortious interference with Greene's business relationship with Eurest.  Accordingly, all claims in Count III shall be dismissed.

IV.   <u>CONCLUSION</u>

For the foregoing reasons:

    1.   Defendants' (Harris Corporation and Harl Dan
         Pierce) Motion to Dismiss [Document 24] is
         GRANTED.

    2.   Judgment shall be entered by separate Order.

SO ORDERED, on <u>Tuesday, May 20, 2014</u>.


                _____/s/_____
                  Marvin J. Garbis
            United States District Judge